Dan Edward ROUTLY, Petitioner–Appellant, Cross–Appellee,

v.

Harry K. SINGLETARY, Secretary, Florida Department of Corrections, Respondent–Appellee, Cross–Appellant.

No. 93–2930.

United States Court of Appeals, Eleventh Circuit.

Sept. 19, 1994.

---

Steven M. Goldstein, Volunteer Lawyers' Resource Center of Florida, Inc., Tallahassee, FL, Adalberto Jordan, Steel Hector & Davis, Greg N. Anderson, Miami, FL, for appellant.

Richard B. Martell, Asst. Atty. Gen., Office of the Atty. Gen., Tallahassee, FL, for appellee.

Before TJOFLAT, Chief Judge, COX, and BIRCH, Circuit Judges.

PER CURIAM.

Based upon a careful review of the record, and essentially for the reasons stated in the district court's opinion, attached hereto as Appendix A, we AFFIRM the district court's judgment denying habeas corpus relief.

IT IS SO ORDERED.

### APPENDIX

### *MEMORANDUM OPINION*

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by a state prisoner, Dan Edward Routly, under sentence of death. The case was commenced in this Court on May 2, 1991 when Routly filed a "Motion to Remove Case from State Court" (Doc. 1)[1] along with a "Motion for Temporary Restraining Order" (Doc. 2) and an "Application for Preliminary Injunction" (Doc. 2). A review of these papers indicated that Routly was, in fact, seeking habeas relief and he was granted leave to state his claims in an appropriate manner. On August 27, 1991, he filed his *pro se* petition (Doc. 7) for habeas relief. Thereafter, Respondents moved (Doc. 12) to dismiss the petition for failure to exhaust state remedies.[2] This mo-

---

1. All documents contained within the case file in this proceeding, Case No. 91–95 Civ–Oc–10, will be referred to by the citation "Doc." followed by the appropriate document number.

2. At the time that Routly filed his petition on August 27, 1991, a motion for rehearing was pending in the Florida Supreme Court concerning the court's affirmance of the circuit court's

tion was subsequently rendered moot and Routly filed an amended *pro se* petition[3] on February 26, 1992 (Doc. 16) to which a response was filed (Doc. 33) on September 1, 1992. Routly then filed a motion (Doc. 36) for appointment of counsel, which was granted (Doc. 37), and the Volunteer Lawyer's Resource Center of Florida, Inc. (VLRC) was appointed as counsel of record. The VLRC filed a motion (Doc. 38) to amend Routly's original *pro se* petition, which was granted (Doc. 39). The amended petition was filed on November 16, 1992 (Doc. 41) and a response was filed on December 29, 1992 (Doc. 44).

The complete record was compiled, and Routly's claims have been fully considered. The Court has concluded that the petition is without merit and should be denied.

*FACTUAL BACKGROUND*

The Supreme Court of Florida, in disposing of Routly's direct appeal, recited the facts surrounding the offense as follows:

> In mid–1979 [Routly] and his girlfriend, Colleen O'Brien, were travelling throughout Florida looking for work. They settled temporarily in the Ocala area when [Routly] was offered employment. [Routly] and O'Brien stayed at several locations during their term of residence in the area. First, they resided in a trailer which belonged to [Routly's] employer. After [Routly's] employment was terminated, they lived in a friend's garage apartment for a short term. Thereafter, they resided briefly at a campground.
>
> During this period of time, [Routly] and Ms. O'Brien were apparently having domestic difficulties which resulted, at one point, in O'Brien leaving [Routly]. For some reason O'Brien accepted a ride from the victim, Anthony Bockini, a retired resident of the community. Bockini dropped O'Brien off at the campground and gave her his name, address, and phone number

with instructions for her to call if she needed help.

> Apparently unable to resolve the dispute with [Routly], O'Brien called Bockini the next day and requested that he come and pick her up. Bockini complied and O'Brien stayed overnight, during which time she began making preparations to take a bus back to Michigan.
>
> The following evening [Routly] went to Bockini's house in an attempt to reconcile with O'Brien. Bockini was not at home at the time, and O'Brien let [Routly] into the house. When Bockini later returned, [Routly] feigned a departure out the back door, but subsequently converged on the victim wielding a gun and demanded him to lie on the bed. [Routly] then bound (hands and feet) and gagged the victim and ransacked his home looking for money and valuables. [Routly] broke ceramic banks on the floor pilfering the contents, and took the money from the victim's wallet.
>
> Next, [Routly] loaded the victim into the trunk of his (victim's) car, told O'Brien to pack her belongings and they set out on a journey purportedly looking for a "field to let him out in." While [Routly] was looking for an appropriate place to discharge the victim, the tail lights on the vehicle began to malfunction. [Routly] drove a short distance further until he found an appropriate place to stop. He pulled off the road, took the victim out of the trunk, shot the victim three times and dragged him up under some bushes.
>
> The partially decomposed body of the victim was discovered sometime later by a person plowing the field. [Routly] and O'Brien drove to Louisiana where he washed the car and abandoned it, keys in the ignition (hoping someone would steal it).

*Routly v. State,* 440 So.2d 1257, 1259–60 (Fla. 1983).

---

ruling on Routly's Rule 3.850 motion. That motion was subsequently denied on January 2, 1992.

**3.** Routly's amended *pro se* petition sets forth the same substantive claims as his original petition

filed on August 27, 1991. He amends the petition only to the extent that he notes in the appropriate sections that all state court proceedings have been exhausted and are final.

## HISTORY OF THE CASE

On December 18, 1979, Routly was indicted by a Marion County Grand Jury. He was later tried and convicted of first-degree murder. Following a separate penalty phase, the jury returned an advisory recommendation of life imprisonment. (R. 916).[4] On November 24, 1980, the state circuit judge, after independent consideration, found five statutory aggravating circumstances and no mitigating circumstances and he therefore overrode the jury's recommendation and sentenced Routly to death. (R. 1305–06).

On December 12, 1983, the Florida Supreme Court affirmed on direct appeal the conviction and the sentence of death. *Routly v. State,* 440 So.2d 1257 (Fla.1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 888 (1984). On July 28, 1986, Routly filed a petition for writ of habeas corpus in the Florida Supreme Court. That petition was denied on February 12, 1987. *Routly v. Wainwright,* 502 So.2d 901 (Fla.1987). In the meantime, on January 1, 1987, Routly filed a motion for post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure in the state circuit court; a subsequent amendment to that motion was filed on June 22, 1987.

On April 21, 1988, the Governor of Florida signed Routly's death warrant and an emergency application for stay of execution was filed on May 19, 1988. Due to the pendency of the Rule 3.850 motion, the state circuit court granted a stay of execution on June 6, 1988 and ordered an evidentiary hearing that was conducted on August 8–11, September 1, and October 20, 1988. On March 17, 1989, the state circuit judge entered an order denying the motion. Routly appealed this ruling to the Florida Supreme Court and, on October 17, 1991, the court rendered its opinion affirming the circuit court's denial of Routly's Rule 3.850 motion. *Routly v. State,* 590 So.2d 397 (Fla.1991). There is neither a death warrant nor a stay of execution in effect at the present time.

## DISCUSSION

The State does not now dispute that Routly has exhausted his state remedies as required by 28 U.S.C. § 2254. As previously noted, the state trial court conducted an evidentiary hearing on Routly's Rule 3.850 motion and determined that Routly's claims, including his claim of ineffective assistance of counsel, were without merit. Because ineffective assistance claims present mixed questions of law and fact, the state court's findings with respect to these claims are not entitled to a presumption of correctness as are factual findings pursuant to 28 U.S.C. § 2254(d) and *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Nevertheless, the burden is on Routly to establish the need for an additional evidentiary hearing. *Birt v. Montgomery,* 725 F.2d 587, 591 (11th Cir.) (en banc), *cert. denied,* 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984). A review of the transcript of the post conviction proceedings in the state court demonstrates that Routly was afforded "a full, fair and adequate hearing" within the meaning of 28 U.S.C. § 2254(d)(6), and that transcript, taken together with the trial record, excludes the necessity of an evidentiary hearing on any of the claims now before this Court. *See Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

In his petition, Routly presents ten claims of alleged constitutional deprivation. Each will be considered in turn.

### Claim I

In his first claim, Routly asserts that the State suppressed critical exculpatory and impeachment evidence of its key witness in violation of his Fifth, Eight, and Fourteenth Amendment rights.

During the trial of the case, Colleen O'Brien, the State's key witness, testified that Routly committed the homicide (R. 585) whereas Routly testified that O'Brien told him that the victim was dead and she wanted his help in getting away from the State of Florida (R. 771–73). In his petition, Routly

---

4. The record of the proceedings in Routly's trial will be referred to by the symbol "R" followed by the appropriate page number. The record of the proceedings in the state court post-conviction evidentiary hearing will be referred to by the symbol "EH" followed by the appropriate page number.

argues that he would have been able to impeach O'Brien's credibility as a witness if he had been given certain evidence that he alleges the prosecution failed to disclose. Specifically, Routly points to a written immunity agreement executed between the State and O'Brien, and documents resulting from the State's efforts to secure O'Brien's presence and testimony at Routly's trial. This evidence, he argues, would have allowed him to cross-examine O'Brien more extensively to show her interest, bias, or prejudice.

■ The prosecution must disclose evidence favorable to the accused if the evidence is material to guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The United States Supreme Court has determined that "[i]mpeachment evidence, [ ] as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). In order to establish a *Brady* violation, a defendant must prove: (1) that the state possessed evidence favorable to the defendant; (2) that he did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and, (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. *United States v. Meros,* 866 F.2d 1304, 1308 (11th Cir.), *cert. denied,* 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989) (citations omitted).

■ On collateral attack, the Florida Supreme Court determined that even if the evidence had been disclosed, there was not a reasonable probability that the outcome of the trial would have been any different. *Routly v. State,* 590 So.2d at 399. After an extensive study of the trial and post-conviction records, this Court similarly concludes that Routly has failed to make the requisite showing to establish a *Brady* violation.

Defense counsel was aware prior to trial that O'Brien received immunity in exchange for her testimony; O'Brien admitted as much during her deposition on July 9, 1980, a full five days before the trial was set to commence.[5] Furthermore, counsel made reference to this immunity on more than one occasion during trial. In his opening statement, defense counsel stated to the jury that "[y]ou will find out that [O'Brien] has been granted immunity from prosecution in this case." (R. 319). Moreover, counsel cross-examined O'Brien concerning the immunity agreement at trial. From that cross-examination, the jury learned that O'Brien was granted immunity in exchange for her testimony (R. 614, line 11), that this agreement had been reduced to writing (R. 615, lines 1–3), that by receiving immunity she would "be able to have a life with [her] baby" (R. 614, line 15) which "means everything to [her]" (R. 617, line 25), that the State paid for her transportation to Florida to testify (R. 615, line 23), that she was threatened with arrest if she did not testify (R. 616, line 3), and that she was, at the time of trial, in the custody of law enforcement officers (R. 613, line 21). In his closing argument to the jury, counsel reminded the jury several times of O'Brien's immunity agreement. (R. 804, line 20; R. 805, line 21; R. 809, line 9).

It is abundantly clear therefore that defense counsel was aware prior to trial that O'Brien had entered into an immunity agreement with the State, and counsel offers no convincing evidence that the State refused to allow him access to this agreement or that they intentionally suppressed the evidence.

As for Routly's argument that the suppression of other documents resulting from the State's efforts to secure O'Brien's presence and testimony at trial amounted to a *Brady*

5. During this deposition, the following exchange took place:

Q. Have you been promised anything in exchange for your testimony in this case?
A. Yeah.
Q. Okay. And what is your understanding of that; what have you been promised?
A. Immunity.

Q. Who made that promise to you?
A. State of Florida.

.    .    .    .    .

Q. Okay. Did you get that in writing?
A. Uh-huh.
Deposition of Colleen O'Brien, July 9, 1980, at 51.

violation, the Court finds, as did the Florida Supreme Court, that this evidence would have provided, at most, cumulative impeachment of O'Brien's testimony.

The jury was well aware, by virtue of the cross-examination conducted by defense counsel, of O'Brien's immunity agreement and her interest or bias. Routly has therefore failed to demonstrate that there existed a "reasonable probability" that the outcome of the proceedings would have been any different had the additional evidence been presented.

Accordingly, this claim is DENIED.

### Claim II

In his second claim, Routly contends that Assistant State Attorney Fitos knowingly allowed the State's key witness to commit perjury at deposition and at trial, failed to correct the material false statements, and himself suborned perjury.

■ When a witness conceals, through false testimony, his or her bias against a defendant and the prosecution knows the witness has testified falsely, the prosecution has a duty to correct the false statement. *See United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Rivera Pedin*, 861 F.2d 1522, 1529 (11th Cir. 1988). "The thrust of *Giglio* and its progeny [is] to ensure that a jury knows the facts that might motivate a witness in giving testimony...." *Brown v. Wainright*, 785 F.2d 1457, 1465 (11th Cir.1986). To establish a *Giglio* violation, a defendant must demonstrate that the testimony was false, that the state knew the testimony was false, and that the false testimony was material, i.e., there was a reasonable likelihood that the false testimony could have affected the judgment of the jury. *De Marco v. United States*, 928 F.2d 1074 (11th Cir.1991).

■ Routly first argues that the prosecutor knew that O'Brien was testifying falsely when she stated during trial that she had not been charged or arrested in connection with the death of Bockini.[6] (R. 613). Defense counsel was also aware, however, that O'Brien's testimony concerning this matter was subject to impeachment. During O'Brien's deposition taken on July 9, 1980, defense counsel asked O'Brien "[h]ad you recently been charged with second degree murder in reference to the death of Anthony Bockini?" to which she responded "Yeah." Deposition of Colleen O'Brien, July 9, 1980, at 52, lines 14–17. There is no violation of due process resulting from prosecutorial nondisclosure of false testimony if defense counsel is aware of it and fails to object. *United States v. Meinster*, 619 F.2d 1041 (4th Cir. 1980). *Accord United States v. Iverson*, 648 F.2d 737 (D.C.Cir.1981); *Ross v. Heyne*, 638 F.2d 979 (7th Cir.1980).

■ Routly next argues that O'Brien's testimony concerning her status at trial and her immunity agreement with the State were false. O'Brien testified at trial that she was not sure whether she was free to go back to where she resided upon the completion of her testimony. (R. 613, line 24). Routly contends that this testimony was false and that O'Brien was not free to leave pursuant to the terms of her immunity agreement with the state. In fact, under the terms of her agreement, O'Brien *was* free to leave after testifying; but, in any event, her testimony concerning her understanding was, at worst, equivocal, and not so misleading as to require corrective action by the state. *United States v. Anderson*, 574 F.2d 1347, 1355–56 (5th Cir.1978). *See also United States v. Petrillo*, 821 F.2d 85, 89 (2d Cir.1987). Colleen O'Brien was, by all accounts, not an extremely sophisticated witness. Although she testified that she "did not know" whether she was free to go, she also testified that she was presently in the custody of law enforcement officials and had been threatened with arrest

---

6. In fact, an information charging O'Brien with second-degree murder was filed and a warrant issued for her arrest shortly before trial. This sequence of events apparently was brought about as a result of the State's difficulty in securing O'Brien's presence at trial. Although O'Brien had agreed to testify against Routly, she disappeared, shortly before the trial was due to commence. Upon her disappearance, the State obtained the warrant for her arrest. She was subsequently located in Oregon and brought back to Florida for the trial.

if she did not testify. (R. 613, 616). These statements communicated her position to the jury and the jury was sufficiently able to test her credibility in light of her threatened position. Likewise, O'Brien's failure to detail every provision of her immunity agreement with the State does not constitute false testimony. Routly has failed therefore to demonstrate that O'Brien's testimony was false.

Accordingly, this claim is DENIED.

### Claim III

Routly next claims that he was denied the effective assistance of counsel at the guilt phase of his trial in violation of the Sixth, Eighth and Fourteenth Amendments. Specifically, Routly raises three points under this claim. First, he argues that counsel failed to adequately investigate the circumstances surrounding his confession and extradition from Michigan thereby rendering his assistance ineffective. Next he argues that counsel failed to effectively cross-examine O'Brien during the trial. Lastly, he argues that counsel was ineffective because he failed to move for a mistrial when the jury revealed during its deliberations that they were unable to hear O'Brien's testimony. Upon a full consideration of the entire record, the Court concludes that these claims are wholly unsubstantiated.

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court established a two-pronged standard for an ineffective assistance of counsel claim:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. *First, the defendant must show that counsel's performance was deficient.* This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment. *Second, the defendant must show that the deficient performance prejudiced the defense.* This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

> Unless a defendant makes both showing, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders that result unreliable.

466 U.S. at 687, 104 S.Ct. at 2064 (emphasis added).

Counsel's performance must be evaluated for "reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. at 2064–65. The reviewing court "should presume effectiveness and should avoid second-guessing with the benefit of hindsight." *Horton v. Zant,* 941 F.2d 1449, 1460 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992). Tactical decisions of counsel are entitled to broad deference. *See Scott v. Dugger,* 891 F.2d 800 (11th Cir.1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990) (counsel not ineffective for failure to cross-examine and present impeaching evidence); *Jones v. Smith,* 772 F.2d 668 (11th Cir.1985), *cert. denied,* 474 U.S. 1073, 106 S.Ct. 838, 88 L.Ed.2d 809 (1986) (counsel not ineffective where counsel made tactical choice not to make opening argument). In order to establish prejudice, the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

### A. *Insufficient investigation concerning the confession*

Routly was arrested by the Flint, Michigan police on December 5, 1979. While being detained, he confessed to having committed the Bockini murder in Florida. Prior to his trial, and again during the trial, Routly's trial counsel moved to suppress the confession on the grounds that (1) it resulted from an unlawful arrest, and (2) was procured involuntarily as a result of an unfulfilled promise, namely, that he would be charged with second degree murder. The motion was twice denied and the jury heard the confession as well as Routly's explanation concerning the circumstances including, in particular, the al-

leged promise of a lesser charge. The specific claim here is not that counsel was deficient in making the motions to suppress, but that he failed to properly investigate and discover all available evidence that might have supported the motions. Specifically, Routly points to two items that he alleges would have strengthened his motion had they been introduced at the suppression hearing and at trial—a copy of his "booking card" in the Flint police station and a copy of the transcript of his extradition hearing in Michigan.

Testimony during the state court evidentiary hearing revealed that the booking card described Routly as a "fugitive from Marion County, Florida" for "homicide." (EH. 178). There was, however, no outstanding Florida arrest warrant at the time of Routly's arrest in Michigan and, from this, it is argued that his arrest was therefore warrantless and illegal. At trial, however, a Michigan police officer testified that there were several outstanding Michigan arrest warrants at the time Routly was arrested. (R. 682). Routly himself testified that he was aware of pending charges against him in Michigan (R. 770, lines 5–6; R. 771, line 1), and he had requested an interview with the Michigan police so he could determine the disposition of those charges (R. 708; R. 727; R. 759). There was no deficiency of counsel in failing to discover and/or introduce the booking card; and, clearly, if it had been introduced, the result would have been the same. *See Routly v. State,* 440 So.2d at 1260–61.

With respect to the transcript of the extradition hearing, Routly says the transcript refers to a charge of second degree murder and that this reference substantiates his claim that he confessed because he was promised that lesser charge. Again, however, there was no deficiency in the performance of his trial counsel on this score because counsel asserted the claim twice before the trial court on motions to suppress and before the jury (through Routly's own testimony) during the trial. It is equally clear, from these same circumstances, that the result would have been the same at each junc-

ture with or without the transcript of the extradition hearing.

Routly also argues that counsel was ineffective when he failed to make a specific contemporaneous objection at trial when the confession was introduced thereby preserving the issue on appeal. The Florida Supreme Court held on direct appeal that because the issue concerning the admissibility of the confession was not preserved by the making of a contemporaneous objection at trial, it was procedurally barred. *Routly v. State,* 440 So.2d 1257, 1260 (Fla.1983). The court further stated, however, that "even had he preserved this argument, we would hold it to be without merit." 440 So.2d at 1261. Clearly, therefore, even if this Court were to determine that counsel was deficient in his failure to contemporaneously object to the introduction of the confession during the trial, Routly has failed to demonstrate that there is a reasonable probability that, if counsel had objected, the confession would have been excluded.

### B. *Ineffective cross-examination of O'Brien*

Routly also claims that counsel was ineffective in his cross-examination of O'Brien because he unreasonably limited questioning about her immunity status, failed to explore the nature of her psychiatric counseling, and failed to question her concerning larceny charges that were pending against her in Michigan. After a thorough examination of the record, the Court cannot say that these alleged failures, in light of all of the circumstances, were outside the wide range of professionally competent assistance.

During cross-examination, counsel brought out the material facts concerning the immunity agreement. (R. 614–17). Specifically, counsel elicited testimony from O'Brien that she had agreed to testify in exchange for "a life with [her] baby." (R. 614, line 15). She also testified that she was, during the course of the trial, in the custody of law enforcement officials (R. 613), and that she had been threatened with arrest if she did not testify (R. 616). In addition, counsel cross-examined O'Brien about her version of the crime and, on two separate occasions, impeached her with inconsistent statements from her

deposition. (R. 626; R. 635–36). Counsel asked O'Brien if she had ever been treated by a psychiatrist or psychologist, and she answered that she had been, on one occasion, two years previously in Flint, Michigan after Routly had broken off their engagement. (R. 606–07).

When viewed in its totality, counsel's cross-examination of O'Brien concerning these matters was more than adequate. It is fair to say that counsel illuminated for the jury any inconsistency in her testimony and adequately explored any bias or motivation she might have had in testifying for the prosecution. With regard to the other area of potential impeachment, i.e., O'Brien's alleged involvement in a theft, the record developed at the state court evidentiary hearing demonstrated that failure to fully explore this area did not prejudice the defense. O'Brien testified that it was *Routly* who had stolen $26,000 from her mother and that she had asked him to return it. (EH. 871–72). As the Florida Supreme Court observed, this additional testimony reflects as negatively on Routly as it does on O'Brien and this Court finds that no prejudice resulted from counsel's failure to more fully explore these areas on cross-examination during trial. *Routly v. State*, 590 So.2d at 403.

### C. *Failure to move for a mis-trial*

▇▇ Routly's final claim of ineffective assistance relates to counsel's failure to move for a mistrial after the jury indicated that it had not heard O'Brien's testimony. Shortly after the jury retired to begin deliberating, they made three requests, one of which was to obtain a transcript of O'Brien's testimony because, according to the jury foreman, they "weren't able to hear [her] testimony." (R. 867–68). The judge advised the jury, upon the request of both the prosecution and defense counsel, that they must rely upon their own recollection, and the transcript, therefore, would not be made available to them. (R. 868–70). Routly now argues that counsel's failure to move for a mistrial at this point rendered his assistance ineffective. The Court cannot accept this argument.

The record clearly reveals a deliberate tactical choice by counsel *not* to consent to the transcript request and, by necessary implication, *not* to move for a mistrial precisely because the jury might have difficulty in coming to unanimous agreement concerning the content of the testimony of the state's most important witness. Indeed, counsel threatened to "request a transcript of the whole trial—if you're going to [provide the jury with a transcript of O'Brien's testimony]." (R. 868–69). *Heath v. Jones*, 941 F.2d 1126, 1139–40 (11th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 981, 117 L.Ed.2d 144 (1992); *Lobosco v. Thomas*, 928 F.2d 1054, 1057–58 (11th Cir.1991); *Jones v. Smith*, 772 F.2d at 674.

Accordingly, this claim is DENIED.

### *Claim IV*

Routly next claims that his right to a fair and reliable capital guilt-innocence verdict determination was violated by the presence of a court official in the jury room for a substantial portion of the jury deliberations. More particularly, Routly argues that the presence of the court reporter in the jury room without any supervision "introduced extraneous factors into [the] capital guilt-innocence determination which created a 'level of uncertainty and unreliability in the factfinding process that cannot be tolerated in a capital case.'"[7] Amended Petition, Doc. 41, at 75.

▇▇ Routly raised this claim for the first time in his Rule 3.850 motion. On appeal the Florida Supreme Court, citing to *McCrae v. State*,[8] held that this claim, not having been

---

7. Shortly after the jury retired to deliberate, they requested that a tape recorder be provided to them in order that they might play the tape of Routly's confession. The court sent a tape recorder to the jury room and also sent the court reporter to the jury room to operate the recorder. The court reporter was present in the jury room for approximately 20 minutes.

8. In *McCrae*, the Florida Supreme Court held that matters that were or could have been raised on direct appeal are foreclosed from consideration by motion under Rule 3.850. 437 So.2d 1388, 1390 (Fla.1983).

raised on direct appeal, was procedurally barred. *Routly,* 590 So.2d at 403. This Court can review the merits of this claim only if Routly can demonstrate sufficient cause and prejudice to excuse his failure to raise this issue on appeal. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The United States Supreme Court has determined that objective factors that constitute cause include interference by officials that makes compliance impracticable, a showing that the factual or legal basis for a claim was not reasonably available to counsel, or constitutionally ineffective assistance of counsel. *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). After examining the record in this case, this Court finds that Routly has failed to demonstrate cause for the procedural default.

▪ In his petition, Routly fails to make any argument that some "external impediment" prevented his appellate counsel from constructing or raising this particular claim, *see Carrier,* 477 U.S. at 491–92, 106 S.Ct. at 2647–48, or that the factual or legal basis for the claim was not reasonably available. Nor may the procedural default be attributed to constitutionally inadequate assistance of counsel. As previously noted, the "proper standard for attorney performance is ... reasonably effective assistance." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. In analyzing attorney performance in the context of procedural default, the Eleventh Circuit has recognized that there may be a "gap" between what counsel *could* raise, i.e., the legal basis is available, and what counsel must raise in order to render constitutionally effective assistance. *See Pelmer v. White,* 877 F.2d 1518, 1523 (11th Cir.1989) ("[b]ecause law is not an exact science, an ordinary, reasonable lawyer may fail to recognize or to raise an issue, even when the issue is available, yet still provide constitutionally effective assistance").

The Court finds that no constitutional violation resulted from appellate counsel's failure to raise this claim on direct appeal. No objection had been made by trial counsel. Routly has failed therefore to demonstrate that this procedurally defaulted claim should be excused under the "cause" standard set out in *Sykes.*

Moreover, there is simply no evidence of prejudice to Routly—no evidence, for example, of any improper exchange between the court reporter and the jurors during the reporter's visit in the jury room.

Accordingly, this claim is DENIED.

### Claim V

▪ Routly argues that his right to remain silent was denied by improper comments by the prosecutor to the jury in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. Specifically, Routly argues that during the *voir dire* examination of the prospective jury the prosecutor made repeated and direct references to Routly's "right to take the witness stand" thereby insinuating to the jury that his constitutional right to remain silent, if exercised, would suggest guilt. Only one of these statements—the second one—was objected to by defense counsel when it was made.[9]

In any event, there was no election in the case to remain silent. Rather, Routly elected to testify and no suggestion was made at trial that he was doing so, thereby waiving his right of silence, only because he felt "challenged" to testify by the prosecutor's *voir dire* examination of the jury. Neither is there any showing that Routly suffered any prejudice by being forced to give incriminating testimony.

9. Specifically, the prosecutor made the following statement:

[n]ow, the Defendant has a right to take the witness stand if he wants to but he hasn't got to, but if he takes that witness stand and testifies under oath you have a right to believe or disbelieve his testimony, the same as you would any other witness, and you should consider if he testifies the interest that he has in the outcome of this case. Do you understand that? ... So he has an interest in the case if he testifies, the same as everyone else. You understand that?

(R. 162–63). Defense counsel objected to the comment and the court overruled the objection; defense counsel then moved for a mistrial and the court denied the motion. (R. 163–64).

There might be a case of constitutional infringement waiting to happen in which a prosecutor "challenges" a defendant to testify and the defendant, who accepts the challenge under protest, then incriminates himself in some way (such as being forced to admit one of the essential elements of the offense). But here there was no "challenge" and there was no incrimination; the defendant sought to exculpate himself. No authority is cited in support of this claim and it has not merit.

Accordingly, this claim is DENIED.

### Claim VI

■ Routly contends that he was denied his right to a speedy trial in violation of his Sixth, Eighth, and Fourteenth Amendment rights.

The record reflects that Routly was taken into custody in Michigan on December 5, 1979 and subsequently transported to Florida where, on December 18, 1979, he was indicted for first-degree murder in the killing of Anthony Bockini. On April 25, 1980, the state moved for a continuance and an extension of speedy trial deadlines under state law because O'Brien, the state's key witness, was experiencing problems with her pregnancy and was unable to travel to Florida for the trial. After a hearing, the extension was granted over Routly's objection. Thereafter, on June 9, 1980, defense counsel filed a motion for discharge pursuant to Florida Rule of Criminal Procedure 3.191 [10] and, after a hearing on June 12, 1980, the motion was denied. Trial was subsequently commenced on July 14, 1980. Routly presented a similar claim on his direct appeal to the Florida Supreme Court in 1983. The supreme court expressly found that the circuit judge had not abused his discretion in extending speedy trial and that, pursuant to Florida law, legitimate grounds existed for the extension. *Routly,* 440 So.2d at 1261. Routly argues that the state failed to demonstrate exceptional circumstances, as specifically required pursuant to rule 3.191(f), *see supra* note 10, and that there was, therefore, no adequate basis for the judge to have granted the state's motion to extend the speedy trial period. Rather, he argues, the state used the pregnancy "to gain additional time for prosecution" and to "reach an agreement with their key witness, Ms. O'Brien." Amended Petition, Doc. 41, at 91, 92.

Routly argues, *inter alia,* that because the length of delay in prosecution was beyond that allowed under the Florida rule, he was denied his right to a speedy trial. The Court notes that nowhere in the United States Constitution is there found a right to be brought to trial within 180 days. Although there is a right to a "speedy" trial found in the Sixth Amendment, this right is "a more vague concept than other procedural rights." *Barker v. Wingo,* 407 U.S. 514, 521, 92 S.Ct. 2182, 2187, 33 L.Ed.2d 101 (1972). In *Barker,* the United States Supreme Court identified some of the factors to be considered in determining whether there had been a denial of a speedy trial: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407

---

10. The rule provides, in pertinent part, that:

    (a)(1) [E]very person charged with a crime by indictment or information shall be brought to trial within ... 175 days if the crime charged is a felony.

    .    .    .    .    .

    (d)(2) The periods of time established by this Rule may be extended provided the period of time sought to be extended has not expired at the time the extension was procured. Such an extension may be procured ... by written ... order of the court on the ... motion by either party in exceptional circumstances as hereafter defined in section (f)....

    .    .    .    .    .

    (f) As permitted by (d)(2) of this Rule, the court may order an extension of the time periods provided under this Rule where exceptional circumstances are shown to exist. Exceptional circumstances shall not include general congestion of the court's docket, lack of diligent preparation or failure to obtain available witnesses, or other avoidable or foreseeable delays.

    Exceptional circumstances are those which as a matter of substantial justice to the accused or the State or both require an order by the court: Such circumstances include (1) unexpected illness or unexpected incapacity or unforeseeable and unavoidable absence of a person whose presence or testimony is uniquely necessary for a full and adequate trial....

    Fla.R.Crim.P. 3.191.

U.S. at 530, 92 S.Ct. at 2192. Weighing all of these factors, this Court finds that Routly has failed to establish a denial of his constitutional right to a speedy trial. Routly was tried within eight months of his arrest and, in fact, within a year of the murder itself. The basis asserted by the state for the delay was unquestionably a legitimate one—O'Brien was in her eighth month of pregnancy and was counseled against traveling by her physician. Routly argues that he asserted his right to a speedy trial "by being continuously available and by objecting to the State's motion for continuance," Amended Petition, Doc. 41, at 91, however, he has failed to demonstrate that he was prejudiced by the court's granting of the state's motion.

Accordingly, this claim is DENIED.

### Claim VII

Routly argues that his rights guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when his confession was admitted into evidence.

■ As previously noted, the Florida Supreme Court held on direct appeal that because the issue concerning the admissibility of the confession was not preserved by the making of a contemporaneous objection at trial, it was procedurally barred.[11] *Routly v. State*, 440 So.2d 1257, 1260 (Fla.1983). Based on this procedural default, federal habeas corpus review of Routly's claim that his confession was involuntary is likewise barred, absent a showing of cause for failure to properly preserve the issue and resulting prejudice. *Wainwright*, 433 U.S. 72, 97 S.Ct. 2497.

Florida law requires that the specific legal argument or ground upon which an objection is based be presented to the trial court in order to preserve the issue for appellate review. *See Occhicone v. State*, 570 So.2d 902 (Fla.1990), *cert. denied*, 500 U.S. 938, 111 S.Ct. 2067, 114 L.Ed.2d 471 (1991); *Bertolotti v. Dugger*, 514 So.2d 1095 (Fla.1987);

*Murray v. State*, 491 So.2d 1120 (Fla.1986); *Barclay v. State*, 470 So.2d 691 (Fla.1985). It is clear from the record that defense counsel failed, after moving to suppress Routly's confession prior to trial and arguing against its admission at trial, to specifically object to the confession at the time that it was actually introduced. (R. 732). The Court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. Routly has not demonstrated that counsel's decision not to object when the confession was introduced at trial was unreasonable under the circumstances.[12] Counsel might well have believed that further objection would have been futile and was unnecessary in view of his earlier motions to suppress which, arguably, preserved the issue of admissibility for appeal. *See Spurlock v. State*, 420 So.2d 875 (Fla.1982), *Thomas v. State*, 419 So.2d 634 (Fla.1982).

■ In any event, Routly has failed to demonstrate that he was prejudiced by the default. The confession was properly admitted by the trial court and the Florida Supreme Court explicitly and correctly held, in the alternative, that this ruling was correct on the merits.

As previously noted, there is sufficient evidence in the record that the Michigan authorities had outstanding warrants for Routly on unrelated charges. (R. 682). Probable cause existed therefore to effect his arrest on the Michigan charges and it was while Routly was being detained on these charges that he voluntarily confessed to the authorities concerning his involvement in the Florida murder. Furthermore, there is sufficient evidence that Routly was informed of his *Miranda* rights (R. 685; R. 695; R. 727; R. 753–54), and that he knowingly, voluntarily and intelligently relinquished such rights (R. 685; R. 697; R. 728; R. 753–54). In fact, the transcript of his confession that was introduced into evidence at trial reflects the following questions and answers:

---

**11.** The court further stated, however, that "even had he preserved this argument, we would hold it to be without merit." 440 So.2d at 1261.

**12.** In fact, Routly makes no argument addressing this issue directly in this section of his amended petition.

Dan, just prior to this, we advised you of your Constitutional Rights. Did you understand those Rights?

Yeah.

Do you agree for us to question you now concerning the incident that we spoke about earlier?

Yeah.

(R. 734, lines 2–7).

As for Routly's argument that the coercive nature of the circumstances rendered the confession involuntary, the jury heard testimony about this issue during trial. Routly testified that he was coerced into giving the confession because he was promised that he would be prosecuted for second degree murder and that O'Brien and their unborn child would be released. (R. 770–71; R. 776). The jury heard contrary testimony from an officer present during, and just prior to, Routly's confession that no such promises were ever made. (R. 730). Another officer testified that, although it is true that Routly waived extradition on a second degree murder charge, at the time that he gave his confession, he had not been informed what degree of offense he would ultimately be charged with. (R. 756). Notwithstanding the trial judge's ruling at the suppression hearing that the confession was voluntary (R. 722), counsel argued to the jury, as he certainly had the right to do, that the coercive and threatening circumstances surrounding the confession rendered it involuntary (R. 810–12). The trial record indicates therefore that defense counsel argued these issues and that the jury nevertheless convicted Routly.

Any argument that the result on direct appeal would have been any different had counsel properly preserved the issue is simply untenable and Routly has failed to demonstrate prejudice as a result of the default.

Accordingly, this claim is DENIED.

13. In *Tedder,* the Florida Supreme Court held that the jury override is to be upheld only if the facts suggesting a sentence of death are so clear and convincing that no reasonable person could differ. 322 So.2d 908 (Fla.1975).

*Claim VIII*

■ Routly next contends that the Florida Supreme Court's affirmance of the trial judge's override of the jury's recommendation of a life sentence was contrary to it's own binding precedent in *Tedder v. State,* 322 So.2d 908 (Fla.1975),[13] and in violation of the Eighth Amendment under *Parker v. Dugger,* 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). Specifically, Routly argues that there was evidence in the record of non-statutory mitigating circumstances that provided a reasonable basis for the jury's recommendation so that meaningful appellate review under *Tedder* should have resulted in a reversal of the sentence; and, because there was no meaningful review resulting in reversal, *Parker v. Dugger* requires that the writ be granted here.

Before trial, Dr. Fausto A. Natal, a psychiatrist, examined Routly and made a report of his diagnosis and findings.[14] A copy of this report was offered and received in evidence for the jury's consideration during the penalty phase of the trial (R. 896). In that report, Dr. Natal set out an extensive description of Routly's personal history and childhood experience:

[Routly] was born in Flint MI. on June 12, 1955, the third (3rd) born of a family of eight (8) children. He remembered his mother as a person that "would not touch me-she pushed me away—never hugged me-ever since I was 1½ years old". The father was the disciplinarian and was very strict. The Examinee said that "he beat me until I bled". When I was 1½ years old, my mother went across the street, leaving my younger brother alone, who was only a few months old, and he slipped-down in the high-chair and choked himself to death" he reported. Since the Examinee was so young at the time, he could not rescue or save his brother, and mother blamed him for this-all the rest of his life-and she beat him-up. He went to a Catholic school and did not believe what the nuns and priests taught him. He did not

14. The diagnosis was anti-social personality disorder but no incompetence to stand trial.

have enough faith to accept any type of religion or doctrine. He related-started seeing a psychiatrist since he was in the 3rd grade. He claims that the whole family had Family-therapy. He described himself as a non-conformist and was suspended from school several times-the first one was for pulling the veil off of the nun. As a child, started stealing and started to like it. He was not stopped by his fathers beatings, and first ran away from home when he was in the fifth grade. He felt like an outsider in his own family. He would sit and watch the family and felt like a stranger. When he was in the sixth grade, his mother packed his clothes several times when he tried to run-away from home, but he would come back. When he graduated from High School, then his mother gave him 48 hours to leave home.

Psychiatric Evaluation by Fausto A. Natal, M.D., Psychiatrist, April 25, 1980, at 2.

Following the trial, the judge entered a written order as required by Florida Statutes section 921.141 [15] stating his findings and his reasons for the sentencing override. He found that five statutory aggravating circumstances existed in the case: (1) that the murder was committed during the commission of a robbery and a kidnapping; (2) that the murder was committed for the purpose of avoiding or preventing a lawful arrest; (3) that the murder was committed for pecuniary gain; (4) that the murder was especially heinous, atrocious and cruel; and, (5) that the murder was committed in a cold, calculated and premeditated manner, without any pretense of moral or legal justification. With regard to mitigation, the judge's order recited:

> As to the mitigating factors under Section 921.141(6) the Court finds that the Defendant has not contended nor has he proven [any of the statutory mitigating circumstances].

Therefore, the Court finds that none of these six statutory mitigating circumstances exist in this case.

The only statutory mitigating circumstance which the Defendant urges upon the Court is his age at the time of the crime. Having observed the Defendant's conduct throughout the trial, and having considered the evidence of this crime, the presentence investigation and the psychiatric evaluation of Drs. Rafael J. Gonzales and Fausta A. Natal, the Court finds that the Defendant was 25 at the time of this crime and that his age at that time is not a mitigating factor in this case.

In addition to the statutroy [sic] mitigating circumstances, the Defendant contends as mitigation in this case the fact that an accomplice was granted immunity and the holding of the Supreme Court in *Brown vs. State,* 367 So.2d 616. The Court finds from the Defendant's own admission, that the only other person present at the commission of this capital felony knew absolutely nothing about the Defendant's plan or intention to commit this crime and therefore there was no accomplice to the commission of this crime for which the Defendant was solely responsible.

The Court has considered the facts of *Brown vs. State* and finds that that case furnishes no evidence of mitigation for this case.

Therefore, the Court finds that absolutely no mitigating circumstances exist in this case, statutory or otherwise.

Sentencing order, December 17, 1980, at 5–6.

On direct appeal, the Florida Supreme Court reviewed each of the trial court's findings with regard to the existence of the five statutory aggravating circumstances as well as the trial court's rejection of any statutory mitigation. The court then said:

> The trial court considered the disparate treatment of Colleen O'Brien, who received immunity, as a possible non-statutory mitigating circumstance. It held, however, that O'Brien was not an accomplice and

---

**15.** This section provides, in pertinent part, that the trial judge set forth in writing "findings upon which the sentence of death is based as to the facts: (a) That sufficient aggravating circumstances exist ... and (b) That there are insufficient mitigating circumstances to outweigh the aggravating circumstances." Fla.Stat. 921.-141(3) (1979).

that mitigation based on this factor was not warranted in this case; we agree. The case at bar is distinguishable on this issue from cases such as *Slater v. State,* 316 So.2d 539 (Fla.1975), where a more culpable co-defendant received a less severe sentence than the appellant, and there was no error in treating the defendant differently than O'Brien. *See Downs v. State,* 386 So.2d 788 (Fla.), *cert. denied,* 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 238 (1980).

We have compared, as did the trial court, the facts in the case *sub judice* with cases where we have upheld the imposition of the death penalty on similar facts and find the sentence imposed to be consistent with those cases. *See, e.g., Martin v. State* [420 So.2d 583 (Fla.1982)]; *Griffin v. State,* 414 So.2d 1025 (Fla.1982); *Combs v. State,* 403 So.2d 418 (Fla.1981), *cert. denied,* 456 U.S. 984, 102 S.Ct. 2258, 72 L.Ed.2d 862 (1982). The lower court properly found the existence of five aggravating factors and no mitigating factors. Even though a jury recommendation is to be accorded great weight by the sentencing judge, death is the appropriate penalty in this situation and the judge was proper in overriding the jury in this case. *Stevens v. State,* 419 So.2d 1058, 1065 (Fla. 1982), *cert. denied,* 459 U.S. 1228, 103 S.Ct. 1236, 75 L.Ed.2d 469 (1983).

*Routly,* 440 So.2d at 1266.

Whether Routly's abuse as a child (and the other matters contained in Dr. Natal's report) was found not to be a mitigating circumstance, or whether it was weighed against the aggravating circumstances and found to be so overbalanced that "no reasonable person could differ" about the result, is entirely a matter of semantics in this case. The sentencing order of the trial judge explicitly states that he considered Dr. Natal's report as well as a presentence investigation report,[16] and that no mitigation was found to exist, "statutory or otherwise." The Florida cases relied upon by Routly to demonstrate a lack of meaningful appellate review in *his*

case under *Tedder* are clearly distinguishable. *Holsworth v. State,*[17] *DuBoise v. State,*[18] *Burch v. State,*[19] and *Brown v. State*[20] all involved situations in which a series of both statutory and non-statutory mitigating factors were present in addition to childhood deprivation and abuse.

The United States Supreme Court decision in *Parker v. Dugger, supra,* is also distinguishable. There, the Florida Supreme Court had (1) struck two of the statutory aggravating circumstances found by the trial judge, and (2) erroneously concluded that the trial judge had not found any mitigating factors to be present. Due to the presumed lack of mitigation, therefore, the Florida court determined that no independent reweighing of the aggravating factors against the mitigating circumstances was required. Because the trial court had necessarily found the presence of nonstatutory mitigation, however, and in view of the elimination of two of the aggravating factors on appeal, the United States Supreme Court held that the petitioner had not received meaningful appellate review, i.e., that the state supreme court had not reweighed (and/or had not required the trial court to reweigh) the reduced aggravation against the existing mitigation. The case was thus ordered returned to the state court for that to be done. Here, of course, there has been no elimination of any of the aggravating circumstances on appeal, and there was no confusion between the trial court and the state supreme court concerning the existence of mitigating circumstances or, more precisely, the lack of mitigating circumstances.

Accordingly, this claim is DENIED.

### Claim IX

Routly argues that he received ineffective assistance of counsel at the penalty phase and sentencing of his capital trial in violation of the Sixth, Eighth and Fourteenth Amend-

---

**16.** The presentence investigation report also described Routly's unpleasant childhood and his father's abuse.

**17.** 522 So.2d 348 (Fla.1988).

**18.** 520 So.2d 260 (Fla.1988).

**19.** 522 So.2d 810 (Fla.1988).

**20.** 526 So.2d 903 (Fla.1988).

ments. In order to prevail on this claim, Routly must establish that his trial counsel's performance was deficient and that this performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052.

It is critical to the reliability of a capital sentencing proceeding that the jury render an individualized decision. *Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978); *Gregg v. Georgia,* 428 U.S. 153, 206, 96 S.Ct. 2909, 2940, 49 L.Ed.2d 859 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976); *Armstrong v. Dugger,* 833 F.2d 1430, 1433 (11th Cir.1987). The jury's attention must be focused on the "particularized nature of the crime and the particularized characteristics of the individual defendant." *Gregg,* 428 U.S. at 206, 96 S.Ct. at 2940. In order for the jury to properly consider mitigating factors relating to the "particularized characteristics of the individual defendant," they must be properly presented by defense counsel during the separate penalty phase.

During the sentencing phase in this case, defense counsel called only one witness—Tammy McClay, a woman with whom Routly had become acquainted since his incarceration on this charge—who pleaded for mercy on Routly's behalf. (R. 892). Counsel also introduced into evidence the psychiatric report prepared by Dr. Fausto Natal. Following the introduction of that testimony and evidence, defense counsel presented a short closing argument, focusing primarily upon the futility of capital punishment. (R. 904–06). During the Rule 3.850 state evidentiary hearing, trial counsel testified that he conducted little, if any, investigation for the penalty phase of trial and denied any tactical or strategic reason for this failure. (EH. 406). He stated at one point that he did not understand the crime to involve any aggravating circumstances sufficient to subject Routly to the death penalty (EH. 433), implying that the presentation of evidence of any mitigating circumstances was unnecessary.

It appears to this Court that defense counsel misunderstood the vital importance of presenting mitigating evidence. Mitigating evidence, when available, is appropriate in every case where the defendant is placed in jeopardy of receiving the death penalty. To fail to do any investigation because of the mistaken notion that mitigating evidence is unnecessary is undisputably below reasonable professional norms.

The Florida Supreme Court has determined that if there is a reasonable basis in the record to support a jury's recommendation of life (*Ferry v. State,* 507 So.2d 1373, 1376 (Fla.1987); *Amazon v. State,* 487 So.2d 8, 12–13 (Fla.), *cert. denied,* 479 U.S. 914, 107 S.Ct. 314, 93 L.Ed.2d 288 (1986)), an override is improper because, under the *Tedder* standard, reasonable people could differ on what penalty should be imposed. Routly contends that there was a "wealth of mitigating evidence" available at the time of trial that would have established a reasonable basis for the jury's recommendation thereby precluding the trial judge's override. This evidence, which consisted of evidence relative to Routly's childhood and family background, was presented during the state court evidentiary hearing on Routly's Rule 3.850 motion. One teacher testified during the hearing and stated that Routly recoiled from physical contact, was hyperactive, and showed other signs of "severe emotional deprivation." (EH. 532–33, 568, 573).

In addition, there are in the record numerous documents that Routly had previously submitted to support this argument. These include affidavits from Routly's siblings in which they state that he had been neglected and emotionally abused by his mother from an early age and that he was frequently physically abused by his father. Routly had also submitted school records that demonstrate that he, as early as the first grade, could not behave normally as he would vacillate between a type of self-imposed isolation and uncontrollable activity. Routly argues that "[t]he aftermath of accumulated rejection, abandonment, and mistreatment fundamentally molded and scarred" him and "played a vital role in programming him to display complete loyalty to Colleen O'Brien, regardless of the personal consequences." Amended Petition, Doc. 41, at 136–37.

In order for Routly to prevail on this claim, however, he must establish prejudice from his counsel's unreasonable assistance. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. To satisfy the prejudice prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. After a thorough and careful consideration of the record in this case, the Court finds that Routly has failed to meet his burden of proof on the prejudice prong.

In the first instance, Routly cannot show that any failure to present mitigating evidence to the jury prejudiced him to any degree whatsoever in the jury's consideration of penalty because the jury recommended a sentence of life imprisonment anyway. Neither can he show that his case was prejudiced in the consideration of the sentencing judge because the essence of the mitigating evidence he now points to was before the judge through the medium of the presentence investigation report and the report of Dr. Natal, both of which were explicitly referred to in the judge's sentencing order; and the same judge, as well as the Florida Supreme Court, declared in Routly's Rule 3.850 proceedings in state court that the result would have been the same. *See Routly v. State,* 590 So.2d at 401–02.

This Court also concludes, therefore, that Routly has not shown a reasonable probability that the result would have been any different if this evidence relative to his childhood had been introduced.

Accordingly, this claim is DENIED.

### Claim X

Routly claims that his right to a reliable capital sentence was violated because the sentencing judge erroneously found and applied aggravating factors. Specifically, Routly argues that the trial judge, in imposing sentence, erroneously found and applied each of the five aggravating circumstances in support of his sentence of death. On direct appeal, the Florida Supreme Court rejected a similar argument and held, after extensive discussion as to each claim, that there was sufficient evidence to demonstrate beyond a reasonable doubt the presence of each of the aggravating factors. *See Routly,* 440 So.2d at 1262–65.

As the trial judge properly noted in his sentencing order, there is ample record evidence to support the aggravating circumstances found. This Court cannot improperly engage in reweighing the evidence after the state court has determined that the sentencing judge's override of the jury's recommendation was constitutional. *See Lusk v. Dugger,* 890 F.2d 332, 336 (11th Cir.1989), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 805 (1990). The issue is not how this Court would have decided the facts. Rather, the issue is whether any rational factfinder, given the evidence as presented, could have found, as did the trial judge in Routly's case, that these five aggravating factors were present. Applying such a standard of review, Routly has not shown that the evidence was insufficient to demonstrate beyond a reasonable doubt the presence of each of these five aggravating factors.

Accordingly, this claim is DENIED.

Upon due consideration, the Court has concluded that Routly's ten separate claims for habeas relief are without merit. His petition is therefore DENIED. The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.