ZAHRA, J.
(dissenting). The majority concludes that reversal of defendant’s felony-murder and armed-robbery convictions is required because the prosecutor failed to meet her duty to correct “substantially misleading, if not false,” testimony from Mark Yancy regarding the compensation paid to him by the Federal Bureau of Investigation (FBI) for information and cooperation. The objection to the prosecutor’s conduct is premised in the notion that the “State may not *495 knowingly use false evidence, including false testimony, to obtain a tainted conviction. . . Ante at 475-476 (quotation marks and citation omitted). I agree with this fundamental proposition, and imagine that no one denies it. But today the majority has turned this rudimentary constitutional principle into a new requirement that the prosecutor not just elicit truthful testimony on direct examination, but also elicit complete testimony, fully disclosing all the facts and circumstances of how that witness came to testify. Further, the majority imposes an additional duty on the prosecutor to correct a defense attorney’s mischar-acterized questions made during cross-examination of a state’s witness.
The record is clear that Yancy admitted being paid by the FBI for his cooperation. Nonetheless, despite the prosecutor’s having elicited testimony from Yancy that he had been paid for his cooperation, the majority vacates defendant’s convictions because the prosecutor did not make it absolutely clear to the jury that the FBI paid Yancy for his cooperation in the government’s case against defendant. I respectfully dissent because I fear the majority now holds prosecutors to the unacceptably high and extraordinarily ambiguous standard of having to correct every instance of mistaken, inaccurate, or incomplete testimony or risk the possibility that every possible or perceived contradiction will be rendered material.[1]
*496 The majority’s claim of error is predicated on the broad proposition “that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with ‘rudimentary demands of justice.’ ”[2] Along these lines, a state may not knowingly use false evidence, including false testimony, or solicit false evidence or testimony and allow it to go uncorrected when it appears, to obtain a tainted conviction.[3] This Court has recognized that “[t]he prosecution’s duty to correct the false testimony of a state witness arises ‘when [the false testimony] appears.’ ”[4]
Each of these principles is sound when one understands how they have been developed and applied. In each case enunciating these principles, neither defense counsel nor the trial court was aware that the state *497 had agreed to compensate witnesses for their testimony because the prosecution did not disclose the agreements. This, however, is not a case in which the prosecutor kept secret the compensation the FBI paid to Yancy for his cooperation. Rather, the existence and extent of Yancy’s relationship with the government and the details regarding the compensation paid to Yancy were fully disclosed and known not only to the prosecutor, but also to defense counsel and the trial court long before trial commenced. For this reason, I conclude that the evidence the majority finds to be false or “substantially misleading” is better characterized as incomplete testimony. Accordingly, I conclude that the prosecutor did not commit an error by failing to clarify the evidence in the manner espoused by the majority. Similarly, I do not conclude that the prosecutor’s closing argument was an improper exploitation of misleading testimony. To the extent that the prosecutor’s actions constituted error, that error was either extinguished by defendant’s waiver, forfeited for lack of preservation, or harmless. I would affirm defendant’s convictions.
I. THE SUPREME COURT CASES RELIED ON BY THE MAJORITY ARE DISTINGUISHABLE
The majority relies principally on Napue v Illinois, 360 US 264, 271-272; 79 S Ct 1173; 3 L Ed 2d 1217 (1959), Giglio v United States, 405 US 150, 154; 92 S Ct 763; 31 L Ed 2d 104 (1972), and People v Wiese, 425 Mich 448, 453-454; 389 NW2d 866 (1986), to support the proposition that reversal is required in this case. All these cases involved witnesses who denied under oath receiving of any remuneration from the government in exchange for their testimony. It is significant, in my view, that in each case the denial of remunera *498 tion was clearly and patently false and, more importantly, that this falsity was known only by the prosecution.
Unlike the key prosecution witnesses in Napue, Giglio, and Wiese, Yancy admitted receiving compensation for his cooperation with the FBI. Moreover, as distinguished from Napue, Giglio, and Wiese, in the instant case it was not a secret that Yancy received compensation from the FBI in exchange for his cooperation. In stark contrast to Napue, Giglio, and Wiese, here there was a pretrial proceeding held for the benefit of defense counsel[5] during which the prosecution presented FBI Special Agent Dan Harris, who was charged with the responsibility of compensating informants. Defense counsel participated in this hearing, which was presided over by the trial court. During the hearing it was fully disclosed that Yancy had received $4,000 for information related to the Pierson Hood gang and for information that led to the charges against defendant.[6]
*499 The fact that the trial court and defense counsel were made aware before trial of the consideration given Yancy for his cooperation with the FBI materially distinguishes this case from Napue, Giglio, and Wiese. This disclosure is fundamental. It is the secreting of evidence that is offensive to due process.[7] As *500 noted in Giglio, “When the ‘reliability of a given witness may well be determinative of guilt or innocence,’ nondisclosure of evidence affecting credibility falls within this general rule.”[8] If disclosure of evidence affecting credibility is timely made, the witness’s credibility should be left to the adversarial process. Indeed, “[t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case *501 will best promote the ultimate objective that the guilty be convicted and the innocent go free.”[9] Our adversarial system of justice “is premised on the well-tested principle that truth—as well as fairness—is best discovered by powerful statements on both sides of the question.”[10] Under our adversarial system, however, each party bears the responsibility for ensuring that its positions are vigorously and properly advocated.[11] And “[a]lthough the judge plays a vital role in the trial of a criminal case, counsel for the parties are also essential components” because “[t]hey too share in the cause of justice.”[12]
In cases in which the defendant claims that the prosecution has left unchecked questionable testimony from a witness, a reviewing court must assess whether the evidence was truly false and material to the proceedings or merely inaccurate, incomplete, or otherwise vague or ambiguous such that the discrepancy is immaterial.[13] As observed by the majority, “it is the effect of a prosecutor’s failure to correct false testimony that ‘is the crucial inquiry for due process purposes.’ ”[14] If the evidence in question was disclosed to the defense in a timely manner, this disclosure should weigh in *502 favor of a finding of immateriality. When all parties to the litigation are aware of the material facts, the adversarial process will separate the wheat from the chaff, leaving all material and pertinent information before the jury.[15]
II. THE ALLEGED “SUBSTANTIALLY MISLEADING” EVIDENCE PRESENTED BY THE PROSECUTOR WAS NOT ONLY DISCLOSED, IT WAS AT MOST INCOMPLETE AND THEREFORE IMMATERIAL
Examination of the testimony elicited by the prosecutor reveals no patent falsity. The majority takes issue with two questions[16] from the prosecutor during Yancy’s direct examination:
[Prosecutor]: Now, you’ve been paid by a federal agency for cooperation. Is that correct?
\Yancy\: Yes.
[[Image here]]
*503 [Prosecutor]: Were you paid for your testimony in this case?
[Yancy]: No.
The majority does not allege that either question and its respective response, taken individually, constituted the solicitation of false or misleading evidence. This is clearly because the responses to both questions are true. Yancy was paid for his cooperation, but he was not paid for his testimony. At most the majority takes issue with the prosecutor’s use of the phrase “federal agency,” framing that language as clear evidence the prosecutor purposefully attempted to distance the witness from the defendant and purposefully obfuscated the fact that Yancy had been compensated for information provided to the FBI. The majority uses innuendo and isolated phrases such as “federal agency” to somehow determine that “[t]he overall impression [with regard to Yancy’s compensation] conveyed was false.”
In reality, any misdirection with regard to the compensation paid by the FBI to Yancy was created not by the prosecutor but by defense counsel during Yancy’s cross-examination:
[Defense Counsel]: Do you deny — first of all, it sounds like you agreed that you were paid $4,500 for cooperating with law enforcement, correct?
\Yancy]: Correct.
[Defense Counsel]: But you deny that it was with regards to this case, correct?
\Yancy]: Correct.
On the basis of this response, the majority claims that Yancy denied that he was compensated for his “cooperation with the defendant’s formal prosecution.” But Yancy was not asked whether he was compensated *504 for his cooperation in the Pass murder investigation; he was asked whether he was compensated “with regards to this case.” Yancy might well have believed that his compensation was not “with regards to this case,” but was instead for his cooperation in the Pier-son Hood gang case. Further, Yancy had just been asked if he had been paid for his testimony in this case. It would be reasonable for Yancy to assume that defense counsel was referring to his specific testimony.
Admittedly, neither the prosecutor nor defense counsel made this clarification. Instead, the prosecutor again asked Yancy to confirm that the compensation he received was not for his trial testimony. It is the prosecutor’s failure to clarify the distinction between compensation for information and compensation for testimony—a confusion brought on by defense counsel’s cross-examination—that the majority finds offensive. More specifically, the majority believes that the prosecutor was under a duty to expressly elicit testimony from Yancy that he was compensated for providing information that implicated defendant for the murder. This failure, says the majority, rendered the prosecutor’s examination either false or substantially misleading.
If this were a case in which the prosecution alone was aware that Yancy was compensated for information that ultimately led to the charges against defendant, I might well have joined the majority opinion. This is not such a case. Defense counsel was fully aware of the specifics underlying the compensation the FBI paid Yancy. Accordingly, defense counsel had in his arsenal all the information necessary to cross-examine Yancy with regard to the incomplete, albeit truthful, testimony elicited by the prosecutor. Importantly, defense counsel conducted a vigorous and effective cross-examination:
*505 [Defense Counsel\: But it was money, right? Real money, right?
[Yancy]: Correct.
[Defense Counsel]: For cooperating, correct?
[Yancy]: Correct.
[Defense Counsel]: With these folks, correct?
[Yancy]: Correct.
IDefense Counsel]: And you got some other benefits, too. Isn’t that right?
[Yancy]: No.
[Defense Counsel]: Okay. Well, are you in prison or jail now?
[Yancy]: Because I didn’t do nothing.
[Defense Counsel]: That’s not my question.
[Yancy]: No I’m not.
[Defense Counsel]: You’re not in prison or jail now. Okay. You weren’t charged with murder or weapons possession, correct?
[Yancy]: I didn’t have a weapon, no.
[Defense Counsel]: That’s not my question.
[Yancy]: No.
[Defense Counsel]: Okay. You were not charged with drug charges, right?
[Yancy]: No.
[Defense Counsel]: I mean you delivered cocaine in the house, right? You handed it to these guys and then you shared it, so you delivered it or at the least used it, right? Didn’t get charged with any of that stuff, right?
[Yancy]: No.[17]
*506 The majority picks and chooses small snippets of testimony to determine that the prosecutor had evil *507 intent to obfuscate the evidence and confuse the jury. This could not be further from the truth. The prosecutor made a timely pretrial disclosure of the evidence affecting Yancy’s credibility. The prosecutor elicited only true testimony from Yancy. Defense counsel had ample opportunity for a vigorous cross-examination with full knowledge that Yancy had indeed been paid money by the FBI for information that implicated defendant in the murder of Pass. Given this compelling information, I simply cannot conclude that any infirmity in the testimony elicited from Yancy constituted false or substantially misleading evidence sufficient to warrant the reversal of defendant’s convictions. Instead, I would conclude that the testimony under review was at most incomplete and not material to the greater scheme of this criminal trial.
III. ANY ALLEGED ERROR IS BARRED BY WAIVER
While defense counsel conducted a vigorous cross-examination of Yancy, counsel chose not to clarify Yancy’s testimony with regard to compensation from the FBI. I conclude that explicit disclosure of evidence affecting Yancy’s credibility, coupled with defense counsel’s subsequent failure to raise the specific issue at trial, constituted waiver of the claim at issue in this case.[18] Significantly, when Yancy denied on cross- *508 examination that he was compensated “with regards to *509 this case,” defense counsel did not object, ask for a mistrial, seek a conference outside the presence of the jury, or otherwise ask the court to strike the allegedly false testimony.[19] Presumably defense counsel viewed Yancy’s testimony as incomplete, vague, and perhaps even evasive, but deemed this testimony best addressed through vigorous cross-examination. And defense counsel in fact conducted a vigorous cross-examination of Yancy, but instead of clarifying Yancy’s testimony with regard to compensation from the FBI, he sought to highlight that Yancy was not paid “with regards to this case” and impeached Yancy by suggesting that Yancy had received not only “[r]eal money” for cooperating with the FBI, but some additional tacit benefit from the prosecution for his testimony and cooperation. An issue is waived if the defendant intentionally abandons a known right.[20] “[W]aiver may be *510 effected by action of counsel.”[21] Because defense counsel had full knowledge of Yancy’s cooperation and compensation and nonetheless chose to impeach Yancy at trial without mentioning the extent of Yancy’s cooperation with the FBI, defendant has waived this issue on appeal.[22]
*511 IV. THE UNPRESERVED ALLEGED ERROR IS FORFEITED
As discussed, defense counsel and the trial court were fully aware that the FBI had compensated Yancy for his cooperation and information implicating defendant in the murder of Pass. Because there was no objection when Yancy denied being compensated “with regards to this case,”[23] defendant’s constitutional claim is unpreserved and subject to forfeiture.[24] “To avoid forfeiture under the plain error rule, three require *512 ments must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights.”[25] “The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings.”[26] The defendant has the burden of establishing each of these three elements.[27] In this case, defendant has failed to show that any perceived error affected the outcome of the lower-court proceedings. In affirming defendant’s convictions, the Court of Appeals relied heavily on the “fairly dreadful state of Yancy’s credibility”[28] to conclude that any error was harmless. The majority believes that the panel’s reliance on Yancy’s dreadful credibility was misplaced because “the impossibility of raising Yancy’s credibility from an already ‘dreadful state’ ” was not the critical issue. Rather, the majority frames the issue as “what effect would likely have resulted if the jury had understood that Yancy was compensated for his information *513 against the defendant.” In this regard, the majority concludes that reversal is required because “the ‘dreadful state’ of Yancy’s credibility would have been even more dreadful had the jury learned that he was paid for his information against the defendant.”
Of course the jury was certainly entitled to question Yancy’s credibility. He admitted that he was a regular drug user, was in a dispute with defendant over money, took Pass’s drugs (though he gave them to Lard), and left the victim “gurgling off his blood” on the floor (though he testified, “What could I do?” and “I thought I was next”), and left town for a year. Even the prosecutor wryly admitted, “[0]ur witnesses aren’t from the Mormon Tabernacle choir. . . .” With that said, “ ‘[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice.’ ”[29] But here, defendant here has only shown a possibility that Yancy’s credibility could be further diminished. In other words, it is entirely speculative that this possibility would have affected the outcome in this case. It is just as possible that the jury would have ignored additional impeachment given the then-existing “dreadful state of Yancy’s credibility.” Simply put, the burden is on defendant, and defendant failed to show that any perceived error actually, instead of possibly, affected the outcome of the lower-court proceedings. Accordingly, defendant has not satisfied his burden of establishing plain error that affected his substantial rights and therefore has forfeited this issue on appeal.
V. THE ALLEGED ERROR WAS HARMLESS
MCL 769.26 provides:
*514 No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice.
This statute essentially embodies Michigan’s harmless-error rule.[30] “ ‘Simply stated,... reversal is only required if the error was prejudicial. That inquiry focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence.’ ”[31]
According to the majority, the alleged error prejudiced defendant because the prosecutor bolstered Yan-cy’s credibility by arguing that he had only been paid for his cooperation in other cases:
Mark Yancy was here, ladies and gentlemen, and he talked to you about [sic] he wasn’t charged in this homicide, and that he admitted he was in the house at the time of the homicide, and that he got the cocaine, and gave it to Lard and the defendant. He told you he did not get consideration on this case for testifying, that he got consideration on other cases that the task force was involved with.
No objection was made to the prosecutor’s closing argument. Further, this argument is consistent with the record evidence from Flint police officer Shawn Ellis, who testified without objection that Yancy was not paid for his testimony and had “cooperated on other investigations with task force officers.” In any *515 event, reviewing courts should not flyspeck trial proceedings with the benefit of 20/20 appellate hindsight. “[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one.”[32] Instead, our law generally demands that trial results not be overturned unless a miscarriage of justice has occurred.[33] This was a 7-day jury trial featuring more than 20 witnesses and numerous exhibits. It is often difficult for seasoned practitioners and judges to keep pace with trial proceedings. It is substantially more difficult for the jury to do so. This one fleeting, arguably inaccurate statement to which no objection was made does not detract from the actual evidence presented at trial and the prosecutor’s truthful statement that Yancy “did not get consideration on this case for testifying.” Moreover, the prosecutor’s statement was responsive to defense counsel’s line of questioning that suggested that Yancy had been compensated for his testimony against defendant. And not only did defense counsel suggest that Yancy had been compensated for his testimony against defendant, but he later stated in closing argument, without any factual basis, that Yancy “lied to you about his plea, whether he pled.” Notwithstanding this assertion by defense counsel, there is absolutely no evidence that Yancy received any deal from the prosecution in exchange for his testimony in this case.
Further, the majority exaggerates the prejudicial effect of the alleged error. The extent to which Yancy’s credibility was bolstered by argument that he had only been paid by the FBI for his cooperation in other cases is, at best, marginal. Additionally, the alleged error was clearly precipitated by the prosecutor’s willing *516 ness to accommodate defense counsel’s trial strategy that avoided “opening the door to Pierson Hood” because, as the trial court noted, doing so would be hazardous.[34] Both the prosecutor and defense counsel fastidiously avoided mention of the Pierson Hood gang during trial. Rather than delve into specific prejudicial information that Yancy had provided to the FBI, defense counsel sought to challenge Yancy on his claim that he was not paid “with regards to this case” and impeached Yancy by suggesting not only that Yancy had received cash from the FBI for cooperation, but that he had also received some tacit benefit from the prosecution for his testimony and cooperation.
Finally, the majority does not address whether even if Yaxley's testimony had been struck from the record, the prosecution nonetheless presented sufficient independent evidence at trial to establish beyond a reasonable doubt that defendant murdered Pass. Even if evidence is improperly admitted to bolster a witness’s character for truthfulness, reversal is not required under MCL 769.26 if there exists other cumulative and independent evidence to support the conviction.[35] The majority apparently assumes that the jury simply did not believe the other key witness for the prosecution, but “[t]he jury is the sole judge of the facts; its role includes listening to testimony, weighing evidence, and *517 making credibility determinations.”[36] Contrary to the assertions of the majority, Lard’s testimony was largely consistent with Yancy’s testimony with regard to the murder of Pass. It would be very difficult to conclude that the jury convicted defendant on the basis of Yancy’s testimony while rejecting Lard’s testimony.
Specifically, Yancy and Lard consistently testified that Lard brought defendant to Pass’s home, that they used a mutual acquaintance’s name to validate their intent to purchase cocaine, and that Pass let them inside. Inside the house, defendant and Pass discussed purchasing cocaine in the kitchen, and both Yancy and Lard saw Pass enter the bathroom, presumably to retrieve cocaine. After Pass returned to the kitchen, both Yancy and Lard heard multiple gunshots coming from the kitchen area, where only defendant and Pass were present. Lard testified that neither he nor Yancy shot Pass, but that defendant did so. Lard’s testimony alone provided a rational basis to establish that defendant shot and killed Pass. In sum, having examined the entire cause, I cannot conclude that the error alleged by defendant affirmatively appears to have resulted in a miscarriage of justice. I would affirm.

 I hope my fear is unfounded, as suggested by the majority in footnote 9 of its opinion. There, the majority suggests that it is the prosecutor’s exploitation of a “false impression” during closing argument that justifies reversal. While I take issue with the majority’s characterization of the prosecutor’s conduct, if this is the majority’s position, it should have said that and no more.
But even if the rule announced by the majority today is intended as a narrow one, as emphatically stated by the majority, the opinion *496 remains rife with directives that a prosecutor must do more than refrain from knowingly arguing to the jury facts known to be untrue. Instead, the majority imposes on the prosecution the burden to do more than ensure that testimony elicited on direct examination is truthful; that testimony must now be truthful and complete. And it also imposes on the prosecution an obligation to correct misguided testimony that a reviewing court might later declare to be “substantially misleading,” even when that testimony is the product of defense counsel’s cross-examination and when, as here, defense counsel is fully aware that the testimony is misleading, has all the information needed to effectively cross-examine the witness on this point, and, as a matter of trial strategy, elects to let that testimony stand.
So if, as the majority states, my fear of the breadth of the majority opinion is overblown, it nevertheless seems to be fully justified and anchored in the various broad statements scattered throughout its opinion that are not congruent with the majority’s claim that it announces a narrow rule.

 Giglio v United States, 405 US 150, 153; 92 S Ct 763; 31 L Ed 2d 104 (1972) (citation omitted).

 Ante at 475-476, citing Napue v Illinois, 360 US 264, 271-272; 79 S Ct 1173; 3 L Ed 2d 1217 (1959).

 People v Wiese, 425 Mich 448, 455; 389 NW2d 866 (1986), quoting Napue, 360 US at 269.

 Specifically, defense counsel made a discovery request seeking
[c]opies of any and all written and/or electronically recorded agreements for the payment of funds by the FBI and any other police agency to any cooperating witness in this cause, including, but not limited to, Mark Yancy and Tarence Lard [a codefendant in this case], and logs and other records pertaining to such payments. A summary of the content of any oral agreements is also requested.
As a result of this discovery request, the trial court conducted the evidentiary hearing at which FBI Special Agent Dan Harris testified.

 Defendant was on trial for the murder of Larry Pass. The majority minimizes the fact that the compensation paid to Yancy was not exclusively for information related to the Pass homicide. In fact, the main focus of the FBI investigation was the Pierson Hood gang and, as Harris testified, Yanc/s compensation was due in significant part for his cooperation relating to the gang activity. Importantly, the record reveals *499 that defense counsel wanted to avoid at all costs any reference to the Pierson Hood gang to ensure that the jury never learned of defendant’s ties to gang activity. See footnote 17 of this opinion. Therefore, it is entirely possible that the prosecutor did not develop the full extent of Yancy’s compensation agreement with the FBI in order to accommodate defense counsel’s strategy of distancing defendant from the highly publicized Pierson Hood gang.

 The majority accuses me of conflating the prosecution’s obligation to disclose exculpatory information under Brady v Maryland, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), with the duty to correct false testimony under Napue, 360 US at 269. The United Stated Supreme Court has stated, however, that “[t]he rule oí Brady ... arguably applies in three quite different situations” and that “[e]ach involves the discovery, after trial of information which had been known to the prosecution but unknown to the defense.” United States v Agurs, 427 US 97, 103; 96 S Ct 2392; 49 L Ed 2d 342 (1976). The Supreme Court observed that one of these situations arises when “undisclosed evidence demonstrates that the prosecution’s case includes perjured testimony and that the prosecution knew, or should have known, of the perjury.” Id. The Court, citing Napue and Giglio, then stated that “a conviction obtained by the knowing use of perjured testimony is fundamentally unfair.” Id. The majority here has created a new rule that wholly separates the duties under Napue from those under Brady even though the duties are inextricably linked. The United States Supreme Court has recognized this, stating that each Brady situation, including those having claims under Napue and Giglio, involves information known by the prosecution but unknown to defense counsel.
While there may be circumstances in which the prosecution has complied with Brady yet failed to meet an overriding duty to correct a witness’s perjured testimony, we ought not let appellate hindsight decouple Brady from Napue in cases in which it is clear that defense counsel was aware that the testimony was arguably misleading and yet declined to clarify it for the jury
The majority attempted to decouple Brady from Napue by citing three federal cases: DeMarco v United States, 928 F2d 1074,1076-1077 (CA11, 1991), United States v Sanfilippo, 564 F2d 176,178-179 (CA5,1977), and *500 Jenkins vArtuz, 294 F3d 284,296 (CA2,2002). The majority's reliance on these cases is seriously misplaced. Tb begin with, DeMarco involved actual perjured testimony, while the instant case involves, at best, “substantially misleading testimony.” Further, a more recent case from the United States Court of Appeals for the Eleventh Circuit, Routly v Singletary, 33 F3d 1279, 1286 (CA 11, 1994), concluded that when “testimony concerning [a witness’s] understanding was, at worst, equivocal, [it was] not so misleading as to require corrective action by the state.” Further, while Routly expressly acknowledged DeMarco, it nonetheless held that “[t]here is no violation of due process resulting from prosecuto-rial non-disclosure of false testimony if defense counsel is aware of it and fails to object.” Id.
Similarly Sanfilippo, was quickly distinguished within its own circuit. See United States v Antone, 603 F2d 566, 571 (CA 5, 1979). Interestingly, in Beltran v Cockrell, 294 F3d 730, 736-737 (CA 5, 2002), the United States Court of Appeals for the Fifth Circuit explained that “[t]he Sanfilippo court did not deal with the situation presented here, where the prosecution used the false testimony consciously allowed by the defense as part of a legal strategy.” (Emphasis added.) Likewise, defense counsel in this case chose as part of his trial strategy to ignore Yancy’s testimony and instead represent to the jury that Yancy and the prosecution had a tacit agreement that Yancy would not be charged for any crime in exchange for his testimony against defendant.
Finally, the majority’s reliance on Jenkins is misplaced because that court expressly stated that defense counsel, unlike defense counsel in this case, had not relied on the witness’s problematic testimony to advance a strategic or tactical omission at trial. In sum, the cases the majority cites are easily distinguishable. Moreover, the majority uses these cases for a proposition that has been rejected by more recent cases in those same circuits. In fact, a majority of federal courts have rejected the rule the majority now invokes. See footnote 18 of this opinion.

 Giglio, 405 US at 154, quoting Napue, 360 US at 269 (emphasis added).

 Herring v New York, 422 US 853, 862; 95 S Ct 2550; 45 L Ed 2d 593 (1975).

 Penson v Ohio, 488 US 75, 84; 109 S Ct 346; 102 L Ed 2d 300 (1988) (quotation marks and citations omitted).

 See Napier v Jacobs, 429 Mich 222, 228-229; 414 NW2d 862 (1987).

 United States v Harris, 498 F2d 1164, 1170 (CA 3, 1974).

 See United States v Martin, 59 F3d 767, 770 (CA 8, 1995) (noting that the prosecutor need not correct every instance of mistaken or inaccurate testimony); Harris, 498 F2d at 1169 (stating the prosecutor need not “play the role of defense counsel, and ferret out ambiguities in his witness’ responses on cross-examination”).

 Ante at 476, quoting Smith v Phillips, 455 US 209, 220 n 10; 102 S Ct 940; 71 L Ed 2d 78 (1982).

 This is not to say that if disclosure of evidence affecting credibility occurred at some point in the pretrial process the prosecution is forever free from the obligation to correct patently false testimony offered by a prosecution witness. There will be some instances in which the false evidence will be so evident and irreconcilable with the truth that action by the prosecutor to effectuate an immediate and complete correction of the record will be required. But those instances will be rare, and that is not the case here.

 The parties understood that testimony relating to the Pierson Hood gang would not be admitted absent defense counsel’s opening the door to such testimony. See footnote 17 of this opinion. This explains why the testimony is scant with regard to Yancy’s compensation. It appears from the record that Yancy’s cooperation in the investigation of the Pass homicide was limited to an interview in 2006 with Flint police officer Shawn Ellis. Thereafter, the FBI continued its investigation into the gang-related activity. We are not informed of the extent of Yancy’s cooperation with regard to the Pierson Hood investigation, but we know that the FBI did not compensate witnesses until the FBI no longer needed the witness’s cooperation. Yancy was compensated in the fall of 2008. This case did not go to trial until the spring of 2011.

 Defense counsel did not highlight why the FBI paid Yancy. As later revealed during a discussion outside the presence of the jury, he had good reason to stay away from this topic:
*506 The Court: The jury is yet to be called for. Are we ready for our jurors?
[Defense Counsel]: No. There was just one issue that I wanted to get your opinion on one way or the other before I start my cross-examination and that is this. Listening to the detective, and it’s no secret there was an interview of Yancy in ’06, in the summer of ’06 if I understood his testimony. My client wasn’t arrested until December of ’07. If I ask the officer to confirm, I won’t be asking the officer why, but if I ask the officer to confirm when my client was arrested, am I opening the door to Pierson Hood? I don’t think I am, but if you think I am, I’m not doing it. So, I need to know.
[Prosecutor]: Your Honor, the reason that there was a delay was because of the Pierson Hood investigation. So, if he wants to go there, it seems to me that it’s only fair that we don’t make Sgt. Ellis look like he wasn’t doing anything. I mean —
The Court: Yeah, we would have to supply the context. I don’t see it as being particularly beneficial. We’ve already indicated, I think there’s been indication that Lard wasn’t arrested until ’07 for an ’05 homicide. It would certainly suggest — if it is the delay in an arrest the defendant is seeking to elicit from the officer, then an explanation for the delay in arrest would be certainly forthcoming. Frankly, I think it’s much, much more hazardous for any gain that’s going to be made.
[Defense Counsel]: All right. I’m not going to get into it.
The Court: Yeah. All right.
Defense counsel’s trial strategy was to avoid “opening the door to Pierson Hood” because, as the trial court noted, doing so would he hazardous to defendant’s case. Rather, defense counsel sought to impeach Yancjfs claim that he was not paid “with regards to this case” by suggesting that Yancy had received some tacit benefit from the prosecution for his testimony and cooperation.
Further, it appears that an integral part of defense counsel’s trial strategy was to avoid mentioning Yancas cooperation in the Pierson Hood gang investigation. This is a significant fact that the majority ignores. And it is significant precisely because the majority holds the prosecutor responsible for failing to “correct” evidence that was not patently false and that the defense introduced for its own purpose.

 While the majority does not share the view that a Napue error can be waived because counsel could have addressed the issue on cross-examination, I note that the majority of the federal courts of appeals have expressed views consistent with this approach: United States v Iverson, 208 US App DC 364, 366; 648 F2d 737 (1981) (“[W]e hold that, absent unusual circumstances, the right of the defendant to disclosure by the prosecutor is deemed waived if defense counsel with actual knowledge of the plea agreement or sentencing status information chooses not to present such information to the jury.”); Green v United States, 266 F2d 483, 484 (CA 1, 1958) (“But [the defendant] cannot have *508 it both ways. He cannot withhold the evidence [that an assistant United States attorney persuaded a witness to commit perjury against the defendant by promising the witness a light sentence and that he would be spared deportation], gambling on an acquittal without it, and then later, after the gamble fails, present such withheld evidence in a subsequent proceeding...."); United States v Branch, 261 F2d 530, 533 (CA 2, 1958) (concluding that when a defendant makes a deliberate choice not to call a witness to testify who claimed to have proof of alleged perjury by a key prosecution witness, ‘lie cannot now by way of motion under [28 USC] 2255 assert a defense ... which was available but not presented at the trial”); United States ex rel Regina v LaVallee, 504 F2d 580, 583 (CA 2, 1974) (concluding that when the defense is aware that the prosecution might have offered a promise of leniency in exchange for a witness’s testimony but the witness denies it, the defense has an obligation to call available witnesses to prove the existence of the promise because “[a] defendant may not obtain a new trial on the basis of evidence which he could have discovered by reasonable diligence”); Harris, 498 F2d at 1169-1170 (“[I]f appellant’s counsel was of the opinion that the errors were prejudicial it was his obligation to interpose a timely objection and seek corrective action by the Court.... He should have taken this course when he learned of the errors, but failed to do so. A defendant may not sit idly by in the face of obvious error and later take advantage of a situation which by his inaction he has helped to create.”) (emphasis omitted) (quotation marks and citations omitted) (alteration in original); United States v Meinster, 619 F2d 1041, 1045 (CA 4, 1980) (concluding that because the defendants had knowledge of a “deal” between a witness and the prosecution but took no action on the matter during trial apart from asking the prosecutor if the deal existed, the defendants waived their objection to the witness’s testimony that he had received no offer of leniency in exchange for his cooperation); Beltran, 294 F3d at 736 (concluding that the defendant waived his right to object to false testimony because “[d]efense counsel was aware that the testimony was misleading but consciously decided not to clarify for the jury” as “part of a deliberate defense strategy’); Decker, 543 F2d at 1105 (“[W]e hold that the Government fulfilled its duty of disclosure by supplying appellants with its recollection of the true circumstances of the negotiations with the witnesses at a time when recall and further exploration of these matters was still possible.”); Decker v United States, 378 F2d 245, 251 (CA 6, 1967) (“We find no decision which fits the case at bar, but it has been held that deliberate toleration of the commission of perjury cannot be later employed to gain judicial relief for one who connived in the use of the peijury.”); Evans v United States, 408 F2d 369, 370 (CA 7, 1969) (“When a criminal defendant, during his trial, has reason to believe that perjured *509 testimony was employed by the prosecution, he must impeach the testimony at the trial, and ‘cannot have it both ways. He cannot withhold the evidence, gambling on an acquittal without it, and then later, after the gamble fails, present such withheld evidence in a subsequent proceeding ....’ ”) (citation omitted); Ross v Heyne, 638 F2d 979, 986 (CA 7, 1980); Sanassarian v California, 439 F2d 703, 703-704 (CA 9, 1971) (citation omitted); Routly, 33 F3d at 1286 (“There is no violation of due process resulting from prosecutorial non-disclosure of false testimony if defense counsel is aware of it and fails to object.”).

 As mentioned, the trial court also presided over and actively participated in the October 6, 2010 hearing in which yancy’s agreement with the FBI was disclosed. Like defense counsel, the court was not surprised by and did not in any way express concern about or take exception to the testimony from Yancy that the majority today declares to be “substantially misleading, if not false.” That neither defense counsel nor the experienced and knowledgeable trial judge (both officers of the court under an ethical obligation to correct false testimony) took exception to this testimony weighs strongly in support of my conclusion that the testimony and evidence in question are not material in the greater scheme of this criminal trial.

 People v Carter, 462 Mich 206, 215; 612 NW2d 144 (2000).

 Id. at 218, citing New York v Hill, 528 US 110, 114; 120 S Ct 659; 145 L Ed 2d 560 (2000). Hill further explained that
[a]s to many decisions pertaining to the conduct of the trial, the defendant is “deemed bound by the acts of his lawyer-agent and is considered to have ‘notice of all facts, notice of which can be charged upon the attorney.’ ” Thus, decisions by counsel are generally given effect as to what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence. Absent a demonstration of ineffectiveness, counsel’s word on such matters is the last. [Hill, 528 US at 115 (citations omitted).]

 See Harris, 498 F2d at 1169-1170. Harris involved a claim of false testimony arising from the failure to disclose a witness’s deal with the prosecution. After the witness was excused but before the trial concluded, the prosecutor informed the defendant and the court of the witness’s remuneration from the prosecution. Accordingly, it was evident that the witness presented false testimony. The defendant did nothing with this information and on appeal claimed that the prosecution had breached the duty to correct false testimony. The United States Court of Appeals for the Third Circuit concluded that the defendant had waived the issue by failing to take any action after being informed of the evidence affecting the witness’s credibility. Id. at 1170. The majority here asserts that because the prosecutor in Harris disclosed to the defendant the full extent and nature of its remuneration with the witness, the prosecution ultimately complied with its Napue obligation. The Harris disclosure came in the midst of the trial and after the critical witness was excused. I respectfully submit that if disclosure of evidence affecting a witness’s credibility is timely when provided in the midst of trial yet after the critical witness has been excused, there should be no question but that the prosecution satisfied its Napue obligation here when it disclosed to defense counsel and the trial court the full and complete extent of Yancy’s compensation from the FBI at the 2010 hearing during which Special Agent Harris testified.

 Again, in each United States Supreme Court case the majority relies on, defense counsel and the trial court were entirely unaware of any of the details relating to the state’s agreements to compensate witnesses for their testimony. Thus, defense counsel in those cases obviously could not have objected. In this case, however, defense counsel was aware and readily could have objected to Yancy’s testimony. Defense counsel’s knowledge invokes an important principle of appellate review. That is, “[t]his Court disfavors consideration of unpreserved claims of error.” People v Carines, 460 Mich 750, 761; 597 NW2d 130 (1999). “Michigan has long recognized the importance of preserving issues for appellate review.” Id. at 762. Moreover, we recognize that “[tjrial is ‘by far the best time to address a defendant’s constitutional and nonconsti-tutional rights.’ ” Id., quoting People v Grant, 445 Mich 535, 551; 520 NW2d 123 (1994) (emphasis omitted). For these reasons I seriously question the propriety of the majority’s chosen standard of review, which only requires a defendant to establish a “ ‘reasonable likelihood’ that the [allegedly false or substantially misleading testimony] affected the judgment of the jury,” quoting Napue, 360 US at 271. In my view, this standard only applies when the issue could not have been preserved at trial. See, e.g., Robinson v Arvonio, 27 F3d 877, 886 (CA 3, 1994) (“[Wjhen it became clear that the prosecutor had not corrected the perjured testimony, the defense attorney could have alerted the judge and sought a remedy that would have eliminated any possibility of prejudice to his client.... Instead, the defense attorney sought to counter the misleading impression through cross-examination and closing argument. Although we agree with [the defendant] that his attorney did not waive the error by failing to call it to the attention of the court, an error which the defense attorney could have corrected at trial is not likely ‘to infect the integrity of the proceeding ....’ ”), vacated 513 US 1186 (1995) (citation omitted) (emphasis added).

 Carines, 460 Mich at 763; see also People v Vaughn, 491 Mich 642, 663-664; 821 NW2d 288 (2012).

 Carines, 460 Mich at 763, citing United States v Olano, 507 US 725, 731-734; 113 S Ct 1770; 123 L Ed 2d 508 (1993).

 Cannes, 460 Mich at 763, citing Olano, 507 US at 734.

 Cannes, 460 Mich at 763. Further, “[t]he reviewing court should reverse only when the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings.” Id. at 774. The majority claims that when “the prosecutor deliberately exploit[s] misleading evidence before the jury, [it] clearly affects ‘the fairness, integrity or public reputation of judicial proceedings.’ ” While I take issue with the majority’s characterization of the prosecutor’s conduct, I also note that the rule of law sanctioned by the majority in this case will give similarly situated defendants a free bite at the apple in future cases. Specifically, defense counsel aware of false testimony can ignore that testimony and roll the dice with a jury, knowing full well that if an acquittal is not obtained, the testimony will afford defendant a reversal on appeal. This rule of law seriously affects “the fairness, integrity, or public reputation of judicial proceedings.”

 People v Smith, unpublished opinion per curiam opinion of the Court of Appeals, issued October 29, 2013 (Docket No. 304935), p 5.

 Carines, 460 Mich at 763, quoting Olano, 507 US at 734.

 People v Lukity, 460 Mich 484, 491; 596 NW2d 607 (1999).

 Id. at 492, quoting People v Mateo, 453 Mich 203, 215; 551 NW2d 891 (1996).

 See Delaware v Van Arsdall, 475 US 673, 681; 106 S Ct 1431; 89 L Ed 2d 674 (1986).

 See, e.g., MCL 769.26.

 In 2007, the Flint Safe Streets Task Force, which included members of local and federal law enforcement, arrested more than 30 people related to the Pierson Hood gang, which was a criminal enterprise. Two of the people arrested were defendant and Lard. However, the circuit court quashed the charge against defendant of conducting a criminal enterprise, and eventually the case proceeded to trial only in respect to the murder of Pass.

 See Lukity, 460 Mich at 488-489, 496-497 (stating that the error was harmless when the prosecutor improperly bolstered the victim’s credibility because an untainted witness testified about the defendant’s inculpatory apology).

 People v Mardlin, 487 Mich 609, 626; 790 NW2d 607 (2010).